Your argument next in Delaware v. Pennsylvania and Wisconsin and the consolidated case. Mr. Katyal. Thank you, Mr. Chief Justice, and may it please the Court. This case concerns a piece of statutory text from 1974 in Section 2503, which is found in the blue brief appendix at page 2A. That provision exempts from the common law a narrow set of instruments, a money order, traveler's check, or other similar written instrument, other than a third-party bank check. The question today is whether two products, MoneyGram agent checks and MoneyGram teller's checks, fall within that exemption. For many years, the defendant states answered that question no. However, after engaging some creative consultants, they changed their mind. They were right the first time for four separate reasons. First, when Congress adopted that language in 1974, the term money order referred to specific commercial products labeled money order and typically sold to unbanked consumers to pay small debts. Neither of those apply to the two disputed instruments here. They're not labeled money order, and they are sold to consumers with bank accounts who are transferring larger sums of money. Second, the FDA was a surgical fix to this Court's 1972 decision with a key purpose behind it to prevent the price of small dollar instruments from increasing due to address collection requirements that states might adopt in reaction to this Court's 1972 decision. That rationale does not apply here, and the two instruments are outside of the FDA altogether. Third, even if you thought these products were within the FDA, the two instruments here fall within the third-party bank check exception. Like all bank checks, they are signed by bank employees, not purchasers. And fourth, while we believe that our reading is the best reading of the FDA's tax structure and purpose, we don't deny one could read the statute differently. But importantly, if you found things in equipoise, two things would independently break any tie for us. One is the doctrine of reading statutes to avoid derogation of the common law, and the other is this Court's repeated emphasis on the need for bright-line rules and predictability in this space. The defendant's interpretation would upend all that, as their own amici acknowledge. Our view of the statute, by contrast, is predictable, reflects longstanding practice, and provides a bright line for the achievement of financial products in the future. Mr. Katyal, how much weight do you put on this money order designation? What if tomorrow morning they simply stamp the top of these two disputed instruments, money order, commercial money order? Would that solve your problem? So, Justice Thomas, if they change the label, we do think that it would mean it's not a money order or a traveler's check. So we do think you look to the label for that. And indeed, I think that's what they say about traveler's checks. But we don't think it would be true for other similar instruments. So we think that in your hypothetical, in which you have the exact same instrument, but it has just a different name on it, that is another similar written instrument. Notably, you know, that's never happened. And the reason is because money orders and those labels are important for consumers and for banks. They want to know what they're getting. They want to know what they're selling. And that's why they can't point to a single example where that label has ever been stripped off. But I agree with you, Justice Thomas, if that happened, that would fall within the FDA, your hypothetical. Well, can you point to any reason in the past why this would be, this definition of money order is so narrow? It would seem to me that over time, it's not necessarily, as you say it is, a discrete set of instruments. So we don't doubt, Justice Thomas, that there is a way to define money order as broadly as my friends on the other side do. If you do that, it blows up things like cashier's checks, certified checks, all the stuff that the American Bank Association is warning you about, and that Judge LaValle couldn't get around because he just said, I'm not going to define it. One final question, and I'm sure my colleagues will have more. But how do you get around a similar, the similarity language? It seems as though all of these are drafts, and that if you say, well, it's not a money order, it looks like a money order in many other ways. So why is it, does it not fall into the similarity category? Yes, Justice Thomas, we don't think it falls into the similarity category. We think that's for things like what you were talking about before in your first question to me, where the name isn't there, and possibly some other things. But here, there are three things about these disputed instruments which aren't true about money orders. First, you can only buy disputed instruments at a bank. Money orders are sold typically at retailers, CVS, Walmart, and the like. Second, you will have a bank account when you buy them. And in third, and the third point is that money orders aren't signed by the bank, but these two disputed instruments are. Now, I know that sounds formalistic. Here's why that matters. Because Congress and the FDA was worried about what this Court invited states to do in 1972, which is to impose address collection requirements on money orders and traveler's checks. And what they said is, these are small denomination instruments. If you do that, it's going to increase the price of them. The disputed instruments, because there is that bank account and because you're going into the bank, that address information is already being collected now. So if you're worried about my friend's point about equity and the windfall to a particular state with respect to these disputed instruments, the states have the easiest fix in the world, a fix they didn't have in 1972, which is to say, whenever you're one of those banks dealing with MoneyGram, you just have to transmit the address information that you're already collecting. But, counsel, you suggest that Congress's concern was the collection of address information. If that was so, they certainly did a weird thing in terms of the statute that they wrote. I mean, the statute did not just say collect the information, which would have solved the problem directly. The statute seemed to take into account the fact that there were going to be circumstances in which that information was not collected. And Congress appeared to be trying to override the common law with respect to what happened, because it was really concerned about inequitable achievement. And so my question is, to what extent do these disputed instruments present that problem? Because if we believe that that's what Congress really cared about, then why would they have crafted a statute that excluded certain instruments that presented that same problem? Yeah, Justice Jackson, we don't think that that windfall concern, that equity concern, applies to the two disputed instruments. So Congress in 1974 was worried about address collection requirements. They said, we want to head that off, because that's going to increase the price of travelers' checks and money orders. That's why they didn't write the statute that you were saying, which is to impose address requirements. The findings in 2501 say, no, we want the reverse, because if states start doing that, it's going to increase the cost of those instruments. And so that concern doesn't apply to the two disputed instruments here, because the address information is already being collected. And then when you're concerned about the equity that still exists with respect to these two disputed instruments, because Delaware has them, not for all bank checks, obviously. Bank of Americas of the world and Citibanks are really the largest cheaters in this space. But with respect to the two disputed instruments, to the extent that states, including my friend's states, if they're worried about the equity, they have the simplest and easiest fix in the world, which is to just require that the information, when you go in and buy a teller's check or an agent's check is issued, it just has to be transmitted to MoneyGram. And if that happens, Justice Jackson, then you avoid this whole equity about state of incorporation, because then the primary rule of the common law would apply, which is the creditor's last address. You can only do that with respect to your own state, right? I mean, every state would have to adopt that rule in order to solve the problem. And Congress, it appears, wanted to solve the problem in a different way. So certainly Congress could solve it nationally. And this court, in Justice Thomas's opinion in Delaware, invited Congress to do that with respect to the inequities and windfall that it said wasn't enough to justify this court departing from the common law. And then you're absolutely right, Justice. Any state that is concerned about the inequity can pass a law, and I think it's probably a pretty easy law for them to pass because, quite honestly, they're just getting extra money. And so it's up to them. What my friends are asking you to do is to basically break from the common law because of their policy concern. And that is exactly what this court has said every time, most recently in the Delaware case, that you don't do. And here's why it's so dangerous. My friend pitches this as a case about the dueling secondary rules, about place of incorporation versus principal place of business. That's what happens if you don't have addresses. But if you adopt his interpretation, you're also blowing up the primary rule. So the primary rule, there's a big dispute or a big gulf between the FDA, this act, which moves away from the last creditor's address, which is the rule of the common law. And so you're not reading that to be Congress's attempt, Congress's attempt, to break from the common law. You're suggesting that what we do here is going to blow up the common law. But I had understood that the statute itself was trying to set out a different set of parameters than what existed in the common law. Oh, absolutely. We don't doubt that they did that with respect to travelers' checks and money orders. But there's no indication that they went beyond that. And we think you should read that narrowly because the entire reason they wanted to move away from the common law with respect to these two instruments is because of the inequity and the addresses not being collected, which would increase the cost of those items. Those don't apply. Those policy rationales don't apply here. And notably, Justice Jackson, Congress in 1974 knew exactly how to write the statute that you're asking for to get rid of the common law for a broader set of instruments. If you look at our blue brief at page 31, it quotes the 1966 Model Act, Uniform Act for the Disposition of Unclaimed Property. And that text is, quote, any sum on which a banking or financial organization or business association is directly liable, including by way of illustration but not of limitation, CDs, drafts, money orders, and travelers' checks. Now, the first part of that statute that I just read to you is exactly the language from 2503. Indeed, Judge LaValle below said it would be the most extreme coincidence that you'd use all of the same language from 1966 and the FDA. But what isn't in there? Everything about by way of illustration but not of limitation, the enumeration of other financial products like certificates of deposits and the like. And so Congress is telling you here in this statute we mean travelers' checks, we mean money orders, and, Justice Thomas, absolutely we mean other similar written instruments. But that can't be everything that is prepaid the way my friends would have it. If someone purchases an agent check or a teller check, what information about that purchaser does the bank transmit to MoneyGram? None. That's what the record says. Nothing? They collect the information, but it's not transmitted. And so the record, like at our appendix, page 599, says the information is collected. Well, they have to tell MoneyGram something. They don't tell the actual name of the payee or the address of the payee, the relevant information here. And, Justice Alito, your opinion in the Yee case talked about the concerns about escheatment and about people not getting due process and the like. And to the extent you're concerned about that, our rule, the common law rule, incentivizes precisely that state solution because states will then say, look, if you want MoneyGram, if you want to come into our state, you've got to transmit that information and close this informational hiccup. That's what our SIR reply at pages 22 to 23 goes through. So that means MoneyGram will now be under a duty to go and find those people and say, you know, here, there's this abandoned check. And if they can't find them, even with the address, then that information all goes into the state unclaimed database. And then you can search by name and address. I'm sorry, go ahead. You make the fair point that the states could require the banks to transmit this information to MoneyGram. But just out of curiosity, why doesn't MoneyGram ask for this information? Would that cost a lot of money? The record doesn't say. I suppose it probably does cost a little bit of money, and MoneyGram's indifferent to this whole question. And the American Bank Association brief at page one says that, look, that these companies are generally indifferent to these things. So it's a very easy statutory fix because states will get money that they otherwise wouldn't get. And that wasn't available in 1974. That's what makes this case so different from the 1974 FDA, because there, and Congress specifically, as I was saying to Justice Jackson in 2501, made a specific finding. Address information's not being collected for traveler's checks, not being collected for money orders. And if you impose that requirement on those small dollar instruments, it's going to increase the cost. These are, of course, large dollar instruments, and so the money is much larger. And so there's a much better incentive, particularly for the reasons, Justice Alito, you wrote about in Yee, to try and collect and find the rightful owners of this property. How much, what's the comparison in terms of total value? I mean, I understand your point that the traveler's checks, the money orders, small amounts. The official checks, the agent checks, and the teller checks, not limited. But how many of each are there? Where's all the money? Is it the money orders and traveler's checks or the big bank checks? Your Honor, unfortunately, the record, I don't believe, gives us any quantification of that. We do know that in 1974, the typical money order was between $1 and $25, and there's other evidence about that. And even up to today, MoneyGram, for example, limits money orders to $1,000. Yeah, but the question there, I guess, is how many of them there are. Correct. And we don't have information about that. I think Congress wasn't concerned as much with overall dollars as they were with the small denominations and the fact that address requirements would impose a much bigger burden compared to the benefit you'd get. Whereas here, you know, I think for these things, teller's checks existed in 1974, bank checks and, you know, agent checks existed just by a different name in 1974. Congress pointedly didn't enumerate any of that in the statute. They used, to use Justice Gorsuch's convoluted phrase from the first argument, convoluted. Sorry. You called Congress's action in the last argument convoluted. And I think that's right here, that if their argument is right, Congress chose a really weird way of going about it. All right. I was sitting here quietly. But now you've drawn me out. Other similar instruments, the language, Justice Thomas. I got a question. Fine. I'll come up with one. All right. What does it mean on your account? And on page 44 of your brief says that Congress likely intended the term other similar written instrument to capture alternate spellings of money order and traveler's check, such as American Express traveler's check, QUE. Okay. Now, I am familiar with various spellings of traveler's check. I am not familiar with various spellings of money order. Help me out. Yes. So one category is exactly what Justice Thomas began the argument with, which is a money order in every way, shape, and form, except it doesn't have the label on it. So argument is not limited, Justice Gorsuch, to different spellings. Same product without the label is what an other similar instrument is. That's one category. Another category are things I think generic products. So just like a copy is called a Xerox, I think Congress in 1974 was worried that a traveler's check might be called an Amex or worried that a money order might be called a Western Union. That's a second category. And then a third category of other similar instruments are some of the things that have been bandied about in this litigation and in the briefs. So there's something called an agent check money order. There's something called a personal money order. That's in our appendix at page 381. There's something called a bank money order. I take your point. Okay. But does it underline another point that may be problematic? And that is that labels cannot control substance in our analysis here. Can we agree on that? We do. Okay. And so our point is labels are very good at deciding traveler's check money order. They're good not just for courts. Well, I guess I'm wondering why they're good for some purposes but not others. Because I think it reflects Justice Gorsuch. You don't like labels when it comes to this little exception here. It's not that we don't like them. If I might just finish and then have at it, okay? But you admit that labels can't control for some purposes. But yet you do ask us to place quite a lot of weight on money order versus traveler's check otherwise. And so I'm stuck there. So help me out. So we think that labels matter because they matter not just for courts. They're after all for banks and consumers. Banks have to figure out, you know, what is this product and which state do we eschede it to? And labels are a really good way to do that as opposed to some convoluted eight-factor test where you've got to have law professors testifying about experts about whether something is a money order or not. So we think labels in general work, but Congress was concerned about more than that. And that's what I was saying to Justice Thomas. And so that's what other similar written instrument does. It's labels for the first part but not for the second part. And I think Congress in 1974 had examples of statutes in which other products were enumerated. So our brief cites, for example, 26 U.S.C. 6311, which is a 1970 statute, which refers to, quote, any certified treasurer's or cashier's check or any money order. I think demonstrating that Congress thought money orders were distinct from these other products. If you adopt my friend's interpretation, cashier's checks, certified checks, all of those become money orders because they are all instruments that prepay money. And as the American Bar Association brief says, that's going to be a disaster because millions and millions of dollars, and there's a little, at least there's some hyperbole, or not hyperbole, there's some subjective quantification of this in the ABA brief, saying that that is incredibly damaging and destabilizing to the financial sector because this has all been around and done a certain way since 1974. So I guess I didn't understand until argument that you're saying that money orders is an only label test. Is that right? And then the similar instruments is where the characteristics of money orders come in. Is that right? Correct. And then what are the characteristics of money orders that you're pointing to? What does some other non-labeled instrument have to comply with in order to be determined to be a similar instrument? Well, I do think it would be a transfer of information in which address information isn't being collected and a small denomination kind of instrument. And so here there's a wide gulf, however you define similar, between the two disputed instruments and agent checks and teller's checks, traveler's checks and money orders. And the three things are, number one, in order to get a disputed instrument, you've got to go to a bank to get it. Second, you will have a bank account when you do so. And third, it's got to be signed by a bank employee. And that's a pretty important distinction, because when something is signed by a bank employee, it makes the bank liable for the piece of paper, as opposed to money orders, which are limited recourse documents, and you can't sue the issuer of a money order the way you can the two disputed instruments. So we think those are three hallmarks. I mean, it feels as though you're picking things that, you know, as you should, that make you succeed in the case. But I could pick three other things that make Arkansas succeed. We're not just randomly picking these. Justice Kagan, it goes to, I think, Justice Jackson's question to me earlier, which is the purpose behind this, which is the address information isn't being collected, it's burdensome to do so. So that's a statutory finding and the equity windfall considerations. Here, for these disputed instruments, the states have the easy fix available to them that wasn't available to them in 1974, because if states did what this Court invited them to do in 1972 in response to the windfall concern, it would increase the cost of those instruments and be problematic. And so that's why Congress said, uh-uh, we're heading it off for those instruments, but not for these. And these factors that I'm referring to you are relevant to that, because they show address information is being collected for the disputed instruments, not being collected for traveler's checks and money orders. That's the key difference between the two. Counsel, the MoneyGram treats one of its other official checks, the agent check money orders, as subject to the FDA. Justice Thomas asked you what happens if they remove that tomorrow. Under your test that you just articulated to Justice Kagan, then it would go back to not being a money order. No, Your Honor. Your Honor, if I understand your question, it's the same instrument. It just doesn't have the label money order on it. They take it off. Yeah. If they take it off, then it's in others. It's issued by a bank, not a retail operator. They do collect information, don't they? For agent check money orders, I think some information is collected, yes. All right. And what was your third criteria? That you have to have an account at the bank. And they have an account at the bank. They may have an account at the bank. So? So with respect to that, you know, limited universe, we do, even there, I guess I should say, let's look at that, Justice Sotomayor. It's at page 230 and 231 is an agent check money order. And so what it says on the front is that there's a picture of it. And it says on the front that, you know, that it's labeled agent check money order. And then on the back it says, if the instrument is designated on its face as a money order, then the following applies. And it says it's limited recourse. Now, if you strike that off from the back, then you might be, then I think you are fundamentally changing the nature of the document. Because you're making it now not a limited recourse document. You're making it something else. And so that actually is a substantive change. I think it's a different, and that's why I'm going through this, because it's different very much than Justice Thomas' hypothetical. So our view on this is generally labels will control. In some circumstances, if you have the very same product, just not the label, then that is another similar instrument. But for your question, which is actually changing the meaning of the document itself, then that isn't one that is another similar written instrument. Thank you, counsel. Justice Thomas, any further? Justice Alito. You say that a third-party bank check is a check that is effective on the signature of a bank officer. But isn't it the bank's liability and not the signature that makes an instrument a bank check? The signature merely indicates that the bank is liable. No, Your Honor. I think the signature is the thing that does make the bank check actually effective. And we point you to MUNS, which we cite to in our brief, for exactly that. And I think your question is really important, because Judge LaValle said, well, I'm going to look to the Hunt Commission to determine what a third-party bank check is. And a third-party bank check, he says, according to the Hunt Commission, is a personal check. But actually, the Hunt Commission says that's just one example. And notably, really importantly, at page 41 of our brief, we say, if you go on and read what the Hunt Commission says, it actually says teller's checks are third-party bank payment systems. So the Hunt Commission invocation boomerangs on them. It underscores that the types of disputed instruments here, these teller's checks, are third-party bank checks. Congress is worried about these larger dollar products like teller's checks, and they specifically exempted them. And so even if you didn't buy anything that I've been saying for the last 25 minutes about, we're not falling within the FDA at all, we would fall within the third-party bank exception. We don't think you have to get there, of course. Whether a bank employee signs the check or not is a formality. What is the effect of that? We think it's more than a formality. We think that is actually the relevant characteristic that MUNS, Wallach, and Lawrence all say that makes something a bank check, to look to that. Now, admittedly, it's not the clearest of phrases, but we think that's the one that gives it some meaning and reflects Congress' 1974 knowledge. Teller's checks were around in 74, and yet Congress didn't enumerate them in 2503, much more narrow statute than the 1966 one. Thank you. Justice Sotomayor? Justice Gorsuch? Thank you. Just to pick up quickly on Justice Kagan's earlier question on similar written instrument, that's kind of a statutory version of justum generis, I suppose, and we're always trying to figure out what the key features are. Why aren't the key features here prepaid money transmission product, doesn't show last known address of purchaser, and the windfall purpose is implicated? So you have arguments, but why aren't those the better features to focus on when we're figuring out what similar means here? Because if you do that, you blow up the statute to include cashier's checks, certified checks, and all sorts of stuff that Congress knew exactly how to name or to write open-ended statutes and didn't. And so to us, going back to the statutory interpretation question, it's like a statute that said rubber bands, paper clips, or other similar items. Yes, could you find some commonalities? Sure, but I don't think it means all office products like desk chairs or paper or things like that. You're looking for something more narrow, and as I said to Justice Jackson, the statutory findings give you what Congress was thinking about here in terms of address collection and the burdens. Thank you. Justice Barrett? Justice Jackson? Yes, just one question that is confusing me. You keep suggesting that larger dollar products are exempted from the statute, things that would be covered by, like the disputed instruments. They deal with larger dollar and money order or smaller dollar. What I don't understand is why that's the case. I've heard you say that there would be an incentive to include address information for larger dollar products. But if that's true, then under the common law, we wouldn't have the inequitable achievement problem. So the fact that the states are fighting about these disputed instruments indicates to me that the disputed instruments don't have addresses on them, which undermines your argument that larger dollar products would necessarily carry with them the address information. Do you understand what I'm saying? Absolutely, Justice Jackson. So the record is clear on this, and I don't think my friends disagree that for the disputed instruments, address and pay information is being found. That's our appendix at page 599. It's the ABA brief at page 22, our appendix also at page 400, and quoting even from 1956, the ABA report. The reason why it's being collected has everything to do with money laundering requirements and the like. 31 CFR 1010 requires collection of this information for anything over $3,000. The informational hiccup is the information is being collected. It's just not being transmitted to money. And that's where the states have a simple statutory fix. They're asking you to do their hard work for them. And if they did that statutory fix, it would be prospective. It wouldn't jeopardize everything that's happened since 1974 in which a state like Delaware has collected, you know, money under a certain set of achievement rules, and they want to unwind all of that. And that would be very destabilizing, not just for the products at issue here, but certified checks, cashier's checks, as the ABA says. Thank you, counsel. Mr. Brawny. Mr. Chief Justice, and may it please the Court. This case presents the problem the FDA was enacted to solve. In Pennsylvania v. New York, this Court concluded that unclaimed financial instruments is sheet to a purchaser's state of residence, or if that's unknown, to an issuer's state of incorporation. Because issuers of certain financial instruments rarely kept purchaser addresses, that meant a windfall for an issuer's state of incorporation at the expense of its fellow states. Just two years later, Congress responded to that inequity by enacting the FDA. That statute says that where addresses aren't typically kept for a class of instruments, those instruments are sheet to the state of purchase. Now, 50 years later, Delaware claims that it's entitled to the exact same sort of windfall that led to the enactment of the FDA. To justify that, it argues that the FDA doesn't cover instruments that function precisely like other money orders, but are marketed differently. But marketing strategies do not define commercial instruments, and they don't justify $250 million windfalls. Recognizing the weakness of that argument, Delaware alternatively claimed that MoneyGram official checks are excluded from the FDA as third-party bank checks. That argument fares no better, because MoneyGram is not a third party, as that term was used in 1974, and MoneyGram's official checks are absolutely not bank checks. Nor, for that matter, does Delaware explain why Congress would have chosen to exclude instruments that present precisely the windfall problem that the FDA targeted. So it's hardly surprising that all three payment systems experts in this case, including Delaware's own expert, agreed that under any ordinary understanding of the phrase third-party bank check, MoneyGram official checks are not third-party bank checks. So we would ask this Court to overrule the exceptions and adopt the special master's recommendation. Mr. Brani, would you spend a few minutes on Mr. Katyal's parade of horribles, if we accept your argument? Sure, Your Honor. I think it's probably easiest to begin with the example of cashier's checks, because there's been a lot of ink spilled on the cashier's check issue in this case. And for that one, we don't believe that cashier's checks are necessarily covered by our definition. So to begin with, our definition requires that an instrument be prepaid. A cashier's check as a class of instrument is not necessarily a prepaid instrument. Instead, as the ABA's amicus brief argues at length, there are many frequent, common, ordinary, everyday situations where cashier's checks are not prepaid. So, for instance, if a bank needs to pay its own obligations, say it needs to pay an electrician or meet a tax bill, it will issue a check drawn on its own accounts. That's a cashier's check. That is not a prepaid instrument. If the bank needs to disperse loan proceeds, it will issue a check drawn on its own accounts. So does that mean we determine cashier's checks one by one by one, depending on whether it's prepaid? No, Your Honor. I think this is one of the reasons why we're judging things sort of on a class of instruments. And as a class of instruments, in contrast to official checks and money orders, these are not always prepaid. So it's a class-wide distinction. But even aside from that, there are other reasons why we believe that cashier's checks, even aside from our definition, would not be swept in under the term money order. And one of those reasons is, I think, as Justice Thomas, your question, reflects, you know, there are instruments in the world that people would not describe as money orders, even if they share some of the common core features. And a cashier's check is a good example of that. We would not, in ordinary parlance, call a cashier's check a money order because it is a unique instrument and that it's issued by the same bank, drawn on that same bank, which makes it a uniquely secure instrument that is different. So in ordinary English, it's a well-known instrument, as Delaware agrees, as the American Bankers Association agrees, and that's a justification for carving it out. And then finally, another reason why we would think it wouldn't be covered is because in 2501, when Congress is describing money orders as a class of instruments, it describes them as a class of instruments for which addresses are not ordinarily kept as a business practice. That does not describe cashier's checks in 1974, and it doesn't describe them today. Why does it describe the disputed instruments? Your opposing counsel says the disputed instruments are a class in which the addresses are typically kept. So I think that sometimes the addresses, I think what the record actually reflects is that sometimes the addresses are collected by the selling financial institution, as could be true, frankly, of a retail money order. So that the statute my friend was referring to is a requirement that if you sell at least $3,000 worth of these instruments or a retail money order, you're required to collect information and maintain it as the seller. That information, however, is not transmitted to MoneyGram. MoneyGram has a policy. It will not accept that information. It will not keep it. So what that means is the issuer, which is the actual holder of the funds here, because it's not the selling bank that holds the money. The day after a transaction takes place, that money is transferred from the selling financial institution to MoneyGram. And it's MoneyGram that holds that. Well, but MoneyGram can, you can require MoneyGram to ask for that information. I mean, and that would solve your problem just like that. Because just like with respect to the others that you say have to be covered and keep the existing or keep the address and purchaser information, MoneyGram would. And then all of that stuff would achieve to your State rather than Delaware. I think, Your Honor, that the reason why our States have not necessarily done that is because I think Congress really, when it passed this statute, put its thumb on the scale and suggested that keeping that kind of information and having to maintain that information, which my friend on the other side admitted would be a burden, it, Congress decided that was an unnecessary burden. Now, Delaware suggests it would only be an unnecessary burden for low dollar instruments. But that's not actually what Congress said. What my friend on the other side is referring to are things like floor statements where certain members of Congress expressed a concern that by requiring address keeping, you could affect the utility of these instruments by driving up their cost. And there are floor statements that reflect that for low dollar instruments. But what Congress actually said, all of Congress in 2501 in the findings of facts, was not that. Instead, it said address collection and maintenance would be an additional burden that is not justified because most of these instruments are purchased in one's home State. And that's Just to be clear, there's nothing in the law that prevents you from requiring MoneyGram to ask for that information? That's correct, Your Honor. Our State's And that would give you everything you're looking for here? It would potentially for prospective relief, but not necessarily for You said in your opening that the difference between the instruments that we know are covered, money orders and traveler's checks and the others, is simply a matter of marketing strategy? Yes, Your Honor. But your friend points out that money orders and traveler's checks on the one hand are low value, high volume, purchased anonymously. On the other hand, the agent and teller's checks are high value, or at least not limited generally. They're not anonymous. They're drawn on an existing bank account, and they're signed by the bank. Now, that seems to be very different than just a marketing strategy. So, Your Honor, I think what Delaware has described there when it's describing money orders is really one segment of the money order market. I don't think that it's accurately described the money order market, certainly as it existed in 1974. So Delaware's own sources that are reproduced in the appendix, for instance, the American Bankers Association report on money orders from the late 1950s, or the Compton's Encyclopedia, which is also reproduced in their appendix. They do discuss money orders, yes, as a product that was frequently sold in low dollar amounts at retailers, oftentimes to unbanked customers. Although, again, low dollar amounts and things like that, there is some equivalence over that, because as Judge LaValle pointed out, going back to 1939, Western Union, in fact, sold money order products denominated up to approximately $3,500, which if we adjust for inflation is about $25,000 today. So hardly a low dollar instrument. Well, what was the value of the typical value of the agent and teller's checks? These products did not exist. These specific products did not exist in 1974. So teller's checks, as a class of instruments, a traditional teller's check did, but the instruments that MoneyGram labeled. I'm sorry, I slipped. They didn't exist in 1974? The MoneyGram products that we are talking about here today, correct, did not exist in 1974. But if I can return to the distinction about the category of money orders for a moment, they describe them again. Their sources do describe them oftentimes as low dollar instruments. But those same sources also describe money orders as instruments that were also sold at financial institutions in the 1970s without those low dollar limits, and obviously weren't aimed primarily at unbanked customers. So their description of the category of what constituted a money order in 1974 is simply not accurate, even on their own sources. Yes, they've described one segment of the market, but that's not the entirety of the market. Congress did not say personal money orders or low dollar money orders. Congress said money orders. And that category in 1974 included instruments sold at financial institutions, and today the agent check money order, which operates precisely like the instruments at issue here, yet it's only sold at financial institutions in high dollar amounts primarily to bank customers, they admit that's a money order. But it lacks all of the things that they say define what a money order is, except the label. So this was Justice Thomas' question. Their argument is essentially if you take the label off, it's no longer a money order, even if you change nothing about the instrument. So a good example of this would be the Western Union example. If Western Union tomorrow made a decision that it was going to relabel its Western Union money order as the Western gram, it would be Delaware's position that that's no longer a similar written instrument, or that's no longer a money order.  I guess I'm not quite sure I understand. Do you disagree that the agent checks and the teller's checks are typically generally whatever for significantly higher value than a traveler's check? Just like the agent check money order could be, Your Honor, because it doesn't have a limit. So, yes, they are typically bought in higher amounts, but we don't think that that's really a substantive. Okay. But suggesting that as a distinction. Do you disagree that the agent checks and the teller checks are typically drawn on existing accounts while the traveler's checks are not? Again, because they're bought at financial institutions, people will oftentimes buy them where they do their banking. I agree with that. But the drawn-on language is not actually correct there. Instead, what you're doing is you're prepaying for an instrument. You may deduct the money from your account, but it's a separate financial instrument. So it's not like an ordinary check, for instance, is drawn on your bank account. These instruments are not drawn on anybody's bank account. If money order is as broad as you're saying it is, what's left for a similar instrument? I think, Your Honor, when Congress uses phrases like money orders, traveler's checks, and then follows it by a catch-all, I think what that oftentimes reflects, as this Court has said, is Congress is concerned with covering the field and not leaving any loopholes. So it may very well be that in 1974, there wasn't a product that existed that wouldn't meet the core definition of what a money order is. So it's just like an in-case, just in case something comes up or we miss something or whatever. That's one way of looking at it. The other option is to ensure, if you accept Delaware's front-line argument, to ensure that you can't simply change the label on an instrument and have it be something else. Yeah, but it might be, right? I mean, I think that this is the strength of Mr. Katyal's argument, that they were thinking of something called traveler's checks. They had used traveler's checks. And they were thinking of something called money orders, like the prototypical things that the Chief Justice was talking about. They had seen money orders. They had used money orders. And then they said, you know, maybe there's some stuff that functions in the same way, that does pretty much the same thing, that has similar characteristics, whatever the relevant characteristics are. So we'll put that third thing in, you know, other similar things. So that seems to me a more likely way of drafting. It's like you have a particular product in mind and another particular product in mind, and then you realize that there are products you don't know about that might function in the same way. And that is, we don't disagree that that's a possibility for what happened here. I just think that the way Congress used the, when it used the term money order in 73, yes, we might now today typically think of an instrument that's sold at a retailer. But the fact is, Delaware's own sources describe money orders as financial and non-financial institutions, and that did not have low dollar limits. So I think they are money orders, as Judge LaValle said, under any common, ordinary understanding. But I agree that, at a minimum, they are certainly similar written instruments because they operate precisely like the instruments that we all agree are money orders. And if I can address briefly one of the labeling points that I think the other side made, that they pointed out, you know, people, generally things are labeled consistent with what you would think they would be. And I think that's right. You know, most, they can't, they don't identify another product sold by another institution that works like these. And that's because this is basically a product where money order had a business model of selling money orders, and it didn't want to alter the structure of how it does things. So it put a different label on it and sold it somewhere else in order to appeal to a different end of the market without fundamentally altering the product itself because they still operate exactly like money orders. Just like a retail money order, you go in, you prepay for it, you get a written instrument in response. The selling financial institution is merely an agent of MoneyGram. It's not a party to the instrument. It's an agent of MoneyGram. And the day after a transaction takes place, it forwards the money to MoneyGram, the selling financial institution does. At that point, whether we're talking about their so-called teller's checks or agent checks, that selling financial institution is entirely out of the transaction. It has no more role. That is the same role that Western Union played on classic money orders in the 1970s. Can I mention a number of different things and ask you to tell me whether you think they are subject to the FDA? So the first one is a conventional cashier's check or a teller's check issued by a local bank and used to pay its own obligations. So I would say under our definition, it doesn't meet our definition of a money order. We have not taken a position necessarily on whether it's a similar written instrument, but I think that there are reasons for believing that it is not because, again, that is not an instrument that would present the windfall problem as Your Honor framed it. And what about a conventional cashier's check or teller's check issued by a local bank and sold to a bank customer? Same thing? Yeah. Again, Your Honor, they would typically keep addresses. In 1974, certainly for cashier's checks and classic teller's checks, if I can briefly just add to that, because we've talked about teller's checks a lot, these instruments, I know I've said this, but to make clear, these instruments are not traditional teller's checks. They label them as teller's checks, but they do not operate like traditional teller's checks. So a traditional teller's check, as it existed in the 1970s, was an instrument, yes, signed by a bank officer. They're right about that part. And they stopped reading basically at that point. But the rest of the definition is signed by a bank officer drawing on funds of his bank at another financial institution. The difference with these items is that's not what's happening here. The signing officer is not drawing on funds of his own bank anywhere, which also indicates that they don't even meet the definition of a bank check. But are they still liable in the teller's check realm? So there is some jumbling of the record on this point, unfortunately, Your Honor. But I think what Delaware's expert ultimately said is at most they might be secondarily liable, but the ultimate liability with the so-called teller's check instrument is MoneyGram, because MoneyGram is the issuer. How about a prepaid cash card? Some grandparents always used to send their grandchildren a MoneyGram for Christmas. And now they want to become more modern, so they send them a prepaid Visa cash card. Not covered either as a money order or a similar written instrument because it has to have a name payee, and gift cards do not have name payees. How about a gift certificate that does have a named payee? I suppose it's possible if that instrument were a draft, there's not really any record development on this point, that we could quibble about that. And I know that there are some states that do cover instruments like that, have statutes that would cover a sheet meant for instruments like that. The reason why I'm struggling with that one is I don't know all the characteristics of a gift certificate as opposed to a gift card.  Why is that? Why not just say, okay, they're all included. That's good. Well, I think, Your Honor, that when Congress uses, to go back to the language of the statute, when it says money orders, traveler's checks, or similar written instruments, it's referring to two things that had traveler's checks and money orders that had understandings in 1974 that we can rely on. And by using that terminology and using those two instruments as an example, other similar written instruments must share some of the core characteristics of what those two instruments share, so I think Congress decided to limit it. On one point of agreement is I think it's probably true, and the American Bankers Association says this as well, if Congress wanted to include cashier's checks, classic cashier's checks, it probably would have said that. It knew what that instrument was. They were well-known instruments at the time, but they didn't present the windfall problem because, again, addresses were kept typically for cashier's checks, as they are today. I assume that gift cards don't escheat, even if they fall outside of the FDA, as you say. They're not subject to the common law rule of escheat, of are they? So that this, does anyone get them? I thought the reason why stores liked them is because a lot of times people don't use them and they just get to keep the money. I think, Your Honor, there's been a development over time in the law as states have realized that there are these things out there that certain states have passed statutes. I don't believe that all states have, and I think Arkansas does not have such a statute, but I think it's just been a development as these things have become more popular. Can I ask you a question that kind of goes sideways? Places in your brief indicate that you're after not just a declaration of rights here under the Disposition Act, but you actually want money damages for past wrongful takings of monies you think belong to your states. What is the cause of action that permits that? Is that an implied cause of action under the Disposition Act? I'm just curious, if we were to agree with you, what happens next and what theory? So I think it is an implied cause of action under the statute, but I would add that we have not litigated the damages issue or the question. Those kinds of arguments haven't been presented to Judge LaValle because the parties agreed to bifurcate the proceedings here. So we haven't addressed any of the damages issues. But as for things I know Delaware discusses in its brief, you know, the possibility that it could need to repay this money. But what I would highlight is, you know, any time we're dealing with unclaimed property, the State is essentially holding it in trust. It's not the State of Delaware's money. It's not really our State's money. We hold it in trust for the true owners. So requiring it to pay that money to the appropriate State, which will hold it in trust for the actual owners, Delaware really doesn't have any reliance interest there that would be upset. But whether there's such an implied cause of action under the Disposition Act would be something that the Special Master would have to resolve after this. For the damages issue, yes, Your Honor. I think that's something that could be resolved. Thank you. There's one other point I wanted to, or a couple of points I wanted to briefly address. I mentioned briefly the bank check thing, but I want to make sure I make this clear. You know, Delaware's definition of a third-party bank check, setting aside whether an issuer or processor could be a third party in 1974, and it can't for the reasons the experts explain, but these instruments don't even meet Delaware's own definition of a bank check. So Delaware says that in order to be a third-party bank check, something must first be a bank check. As I mentioned earlier when we were discussing teller's checks, a bank check, and this is really, you've only been offered two sort of reasonable readings of what that term meant in the 1970s or even today, one of which I'll call the sort of technical definition. This is at page 37 of their exceptions, where they say that a bank check is an officer, and as I said before, they stop reading at that point, but it actually says drawing on funds deposited in the officer's own bank, that's a cashier's check, or drawing on funds of the officer's bank deposited in another financial institution. That's a classic or traditional teller's check. Again, that does not describe these instruments here. When the bank officer signs, one, he's signing as an agent of MoneyGram. To the extent that's not already obvious as a functional matter, the contracts between MoneyGram and the financial institutions make very clear. The financial institution is an agent of MoneyGram. So it doesn't, these instruments don't meet that definition because it's not signing to draw on any funds that are in control of the selling bank. Instead, it's MoneyGram that has the money, and it's MoneyGram that is responsible for paying the drawee bank or for reporting the unclaimed property. The other definition of bank check that you've been given is a broader definition than that, and it's the definition that Brady's Law of Bank Checks, which is, again, reproduced in Delaware's appendix, gives for bank checks. It describes a bank check as both those, that technical definition that I just mentioned, but also ordinary checks. In the 1970s, going all the way back until World War I, bank check had been used as a terminology, used as a term under Brady's Law of Bank Checks to both mean those specific instruments issued by banks, but also ordinary checks. And that's part of why a third-party bank check ultimately, what that phrase means, if we're in the similar written instrument provision, is an ordinary check. The impression I got reading your arguments and your friend's argument is that nobody has much of an idea what a third-party bank check is. Is that a fair? That's fair, Your Honor. I think that we are, however, stuck with two things. We have to at least try and figure out what the terminology could have meant using similar phraseology in the 1970s. And, you know, again, they've agreed that it has to at least be a bank check. And we're in agreement there. Something must at least be a bank check. And these don't meet that definition. But in terms of what the entire phrase could have meant, again, this is another example where I think you've only been offered two realistic options based in the way similar phraseology was used in the 1970s, neither one of which would describe these instruments. So Delaware says that in the phrase third-party bank check, the third-party refers to an outside issuer or payer. The problem with that is that that's not the way third-party is used on a financial instrument. It wasn't used that way in the 1970s. All the experts agreed on that. Instead, when somebody referred to the third-party on a check or third-party in a financial instrument, that third-party reference was always a reference to a party that ultimately got paid on an instrument. So sometimes, for instance, it was used like in the twice-endorsed check definition, where third-party check is a common enough phrase then and today that it's actually defined in Black's Law Dictionary as a twice-endorsed check. So the third-party on that instrument is the endorsee, the third-party to the original transaction who's the payee on that instrument. The other way the phrase third-party in check got used in the 1970s was in the And there, again, the reference was always to the party that ultimately got paid, the payee. So a third-party payment service, as the Hunt Commission explains, but it's not the only example, is a mechanism whereby a deposit intermediary transfers funds to a third-party payee, a third-party account holder, upon the orders of the depositor. So, again, there, the phraseology is used to reference the ultimate payee. It's never been used. And Delaware doesn't cite a single source where it was used in the 1970s to refer to an outside issuer or processor. And what that means is they've offered a definition that is in no way anchored with the way the terminology was used in the 1970s. And don't we also have the legislative history that suggests that the inclusion of third-party bank check was supposed to be a technical or minor change? The thing that is a little concerning to me is that if it is used to exclude instruments that function like money orders, then we're talking about a huge carve-out to a statute that was designed to solve the inequitable achievement problem in a way that doesn't seem technical or minor. I absolutely agree with that, Your Honor. That Treasury, when it requested this, and it's undisputed. Yes, it's legislative history in some sense, but it's really drafting history. Nobody disputes that Treasury requested this exception. And Treasury characterized it as a clarifying amendment that was designed to cure an ambiguity in the statute, which suggests that it was sort of the narrow change to the statute to make something doubly clear. And I think defining a third-party bank check as an ordinary check really fits that characterization of a clarifying amendment and a narrow sort of belt-and- suspenders approach to make sure that ordinary checks, which obviously do not present the windfall problem because, one, we have addresses because we have account information, right, but also aren't prepaid. So that is entirely consistent with that sort of legislative history. I guess they failed in that endeavor to make things doubly clear. Well, so the generous version of this, I think, Your Honor, is that the way the phraseology was just sort of used at the time, you know, we're sitting here 50 years on and, you know, banking regulators have their own terminology, but the thing that I would emphasize is that, you know, third-party payment was, in fact, as pointed out at Arkansas's appendix at 177, so common that the Washington Post said that a third-party payment today means essentially a checking account. So that was ordinary phraseology that maybe has gone by the wayside, but it is phraseology that was used at the time. Let's start. Your argument is that in 1974, everybody would have known what a third-party bank check means? I actually do remember 1974. I think banking regulators might have known what it meant, maybe not ordinary people, but. Thank you, counsel. Justice Thomas, anything further? Do you think we do more harm or less harm if we take the special master's suggestion that we decide this case without adopting a firm definition of money order? That's what he tried to do, correct? Correct. I think, Your Honor, that Judge LaValle's approach made sense in that under any ordinary understanding of the term money order, as the sources, Delaware sources, again, the ABA report on money orders from the late 1950s, the Compton's Encyclopedia define money order. It includes instruments sold by financial institutions, not in low-dollar amounts. And it includes instruments like the agent check money order here. And I think that is when Congress adopted the term money order. You haven't answered my question. I think that it meets any ordinary definition. So I don't think that it does any harm to define it that way. I know they present we started with a parade of horribles, for instance. Do we do less parade of horribles if we define it your way? Because you take care of cashier's checks and, I presume, certified checks by calling them a prepaid draft, correct? Correct. The reason why I struggle with this is I think both things are neither one does that much harm, because, again, they're alluding to this possibility of a parade of horribles, but they don't point to anything that would present that parade of horribles. You know, cashier's checks, even if you... Well, you waited how long to sue? They're afraid of all the guys who are going to come after you. Come and sue now. And they have good reason to worry, because once we write a decision, the world will have the roadmap. So what I would say to that, Your Honor, is that at least outside of the context of this case, I'm not aware of a situation where anybody, they allude, for instance, to states having brought suits over cashier's checks, and even in those cases, nobody that I'm aware of is arguing that a cashier's check is a money order. Instead, those cases are all about the similar written instruments clause, but either way, I don't think that our definition, as I started by saying, necessarily requires treating them that way. I think they're well-known instruments, and if Congress had intended to include them, it probably would have used that language, because they were well-known instruments at the time, and they just don't fit what Congress describes in 2501 as a money order, because they're not instruments for which addresses weren't kept as a business practice. Thank you. Justice Kagan? Gorsuch? No? Justice Barrett? Justice Jackson? One final question. So Justice Kagan pointed out that Congress might have been intending to cover the field. It seems as though your friend says that really Congress was worried about no addresses, and as a result, large money instruments wouldn't fit in the statute because there was an incentive to have addresses. And I understood you to be focusing on Congress's concern about inequitable achievement, in which case these instruments would be covered. So can you just, as a final word here, talk about what the purpose of this statute is? Well, I'll start with the purpose of the statute is to address those instruments that presented the windfall inequity problem associated with the Court's common law rule. I think what they're suggesting is there would be an incentive to keep addresses for larger dollar instruments. However, this case is a prime example of that hasn't happened. These are larger dollar instruments, and MoneyGram does not keep addresses. And the point here is that it's the issuer. It's the party that is actually responsible for paying these instruments. It's the party that holds the unclaimed property, and it hasn't kept those address information. So, I mean, to the extent Delaware is suggesting that that somehow makes a difference here, the record just doesn't bear that out. But, again, going back to the other point about, you know, Congress's actual concern was not just the low dollar instruments. Congress's concern was that requiring addresses to be kept for money orders of the class of instruments and other similar written instruments would be an additional burden that is not justified in light of the fact that people buy these instruments where they do their banking. They buy them in their home state. So if you required addresses and all the burdens that go along with that, it's simply going to reflect the same place. So what Congress is saying in 2501 is, to use Learned Hand's phrase, the game is not worth the candle here. Congress just decided it was easier just to have these instruments that sheet to the state of purchase, regardless of what their value would be. Thank you. Thank you, Counsel. Rebuttal, Mr. Cotteel. Thank you, Mr. Chief Justice. Five points. First, as the Chief Justice said, they can solve this problem easily by saying MoneyGram has to have the information. The information is already being collected by the banks. The only question is closing that informational hiccup. And that's a lot better, Justice Sotomayor, than the instrument-by-instrument litigation that will be invited by their approach. His answer to that was to say, to the Chief Justice, was, well, Congress put its thumb on the scale. They did with respect to those two instruments. The question in this case is, did they do so for anything more than that? And the reasons why Congress isolated those two instruments don't apply here. The other point is, Congress is the solution to this. Even if you don't think states will have this easy fix, which I can't understand to this day why they haven't done it, but Congress can, of course, do that. That's what you said in the Delaware case in 1993. If you're worried about equity concerns, Congress should fix it. And what did you point to in that decision? You literally pointed to 2503 and said, that's the solution if you're worried about equity concerns. Second, with respect to third-party banks, my friend says that there's no expert testimony that supports our position. That's a misreading of the record. The expert, Ron Mann, just didn't support our position on the words directly liable back down below. As this case comes to the court, we agree Professor Mann was wrong with that. But with the definition of third-party bank check, I think, Mr. Chief Justice, you said, well, nobody really knows what it means. We actually think the Hunt Commission does know what it means, and they told you what it means in that report, and that says tellers' checks are included. Now, my friend says, this is our third point, that cashiers' and certified checks are different. Well, first of all, note that he doesn't necessarily disclaim them. He says, well, we're not necessarily saying it. There's already litigation about cashiers' checks and certified checks, as the ABA brief points out. There have been key TAM lawsuits that have been filed. He says, well, cashiers' checks aren't prepaid. Most cashiers' and certified checks are prepaid. The only ones that aren't prepaid are the ones in which banks are paying their own expenses, and our brief explains why we think those types of checks are covered under the statute. Fourth thing, Justice Sotomayor, you had said, or excuse me, Justice Jackson, you had said, the question in this case is, what is the field that Congress occupied? Congress knew exactly how to write the statute they want. They had the 1966 example. They didn't do that here. They wrote a much more narrow statute, and if you define, Justice Jackson, a money order as anything that transmits money that is prepaid, you blow up the statute. It means you can't explain what travelers' checks means, you can't explain what is left for other similar written instruments. Everything would be a money order. Nothing would be similar to it, and that's why Congress, we think you should look to the rationales behind what Congress did. You pointed to the legislative history in the Treasury Department, but the Treasury Department just says, essentially, that this is a belt and suspenders fix. It doesn't say that something like tellers' checks, which the Hunt Commission defined as being a third-party payment system, wouldn't be included. And finally and last, if you adopt our solution, the common law, it incentivizes exactly the kind of concerns that Justice Alito is worried about in Yee. It avoids any questions about these other instruments, from gift cards to cashier's checks to bearer's bonds and the like, and it avoids threatening the common law primary rule, because the primary rule is creditor addresses and Justice Thomas, your opinion in Delaware said that has venerable old roots going all the way back to old England. If they win, forget about place of incorporation, if they win, the primary rule of the FDA will control, which is to move away from last creditor's addresses. That is something that there's been zero support that my friend has offered on the other side for, and that's why that old presumption that you read litigation of the common law has special force here. We don't doubt, can you read the statute the way my friend does? You can. But if you do so, it doesn't make sense of the statute and threatens all sorts of other financial instruments, and as the ABA says, that's something you should be really, really concerned about in this unique area, particularly because, as Justice Sotomayor points out, this litigation can go all the way back to 1974 and unwind not just the two disputed instruments here, but every other financial instrument. The safe thing to do is what you've done in case after case, which is to say if we're concerned about equity, that's something for Congress, it's something for the states, it's not for this Court. Thank you, Counsel. The case is submitted.